**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                    No. CR 09-2964 JB

PAUL D. RAINBIRD, and
JUNE L. ORTIZ,

        Defendants.

**AMENDED[1] MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on: (i) the Response of the United States to Presentence Investigation Report, filed September 30, 2011 (Doc. 117)("Response to PSR"); and (ii) the Defendant Paul Rainbird's Objections to the Presentence Investigation Report, Reply to Response of the United States to Presentence Investigation Report, and Sentencing Memorandum in Support of a Variance, filed September 30, 2011 (Doc. 118)("Objections to PSR").  The Court held a sentencing hearing on October 14, 2011.  The primary issues are whether the Court should: (i) apply a 2-level enhancement under U.S.S.G. § 3B1.3 based on Defendant Paul D. Rainbird allegedly abusing a position of trust; (ii) apply a 2-level enhancement under U.S.S.G. § 3B1.3 based on Rainbird allegedly using a special skill to commit his offenses; (iii) apply a 4-level enhancement under U.S.S.G. § 3B1.1 based on Rainbird allegedly being the leader or organizer of otherwise extensive criminal activity; (iv) accept Rainbird and Plaintiff United States of America's stipulated amount of $94,500.00 in restitution; and (v) downwardly vary on Rainbird's sentence.  Because the

---

[1]The amendments to the Court's Memorandum Opinion and Order, filed December 2, 2011 (Doc. 139), include further explanation on why the Court imposed its sentence and why it varied to the offense level to which it chose to vary.

Court does not conclude that Rainbird held a position of trust or abused any position of trust he held, the Court will not apply a 2-level enhancement under U.S.S.G. § 3B1.3.   Because Rainbird possessed no special skills, the Court will not apply the 2-level enhancement under U.S.S.G. § 3B1.3.  Because Rainbird was not the leader or organizer of otherwise extensive criminal activity, the Court will not apply a 4-level enhancement under U.S.S.G. § 3B1.1(a).  Because Rainbird has not contested the United States Probation Office ("USPO") applying the enhancement, the Court will apply a 2-level enhancement under U.S.S.G. § 3B1.1(c) for organizers, leaders, managers, or supervisors of criminal activity.  Because the parties have stipulated to an amount of $94,500.00 in restitution, the Court will accept the stipulation and order Rainbird to pay this amount in restitution pursuant to the stipulation.  The Court will downwardly vary to a sentence of 33 months.

## FACTUAL BACKGROUND

Rainbird is co-Defendant June L. Ortiz' uncle.  He is fifty-eight years old and is roughly 20 years older than Ortiz.  Rainbird was a "trusted tribal member" of the Pueblo de San Ildefonso, New Mexico.  Presentence Investigation Report ¶ 53, at 17 (disclosed Sept. 20, 2011)("PSR").  Rainbird attended school at St. John's College in Santa Fe, New Mexico in 1973.  <u>See</u> PSR ¶ 78, at 21.  He then attended the College of Santa Fe in 1976.  <u>See</u> PSR ¶ 78, at 21.  He earned a bachelor's degree in political science.  <u>See</u> PSR ¶ 78, at 21.  From 1977 to 1978, Rainbird attended the School for the State Judiciary in Reno, Nevada.  <u>See</u> PSR ¶ 79, at 21.  Rainbird then went to graduate school from 1983 to 1985 where he took graduate classes in public administration.  <u>See</u> PSR ¶ 80, at 21.  Rainbird has served as a tribal judge "off and on" since 1977.  PSR ¶ 85, at 22.  Rainbird served as the Chief Judge for the Pueblo de San Ildefonso from 1999 to 2005.  <u>See</u> PSR ¶ 85, at 22.  Rainbird served as the Lieutenant Governor for the Pueblo de San Ildefonso from 2008 to 2010.  <u>See</u> PSR ¶ 83, at 21-22.

Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") agents began investigating Rainbird and Ortiz for failure to comply with certain laws regarding the sale of cigarettes and cigarette taxes. PSR ¶¶ 10-13, at 6-7. Businesses in the State of New Mexico that sell cigarettes must affix a New Mexico tax-paid stamp on every pack of cigarettes "at a cost of $.91 (now $1.60) per pack of twenty cigarettes." PSR ¶ 11, at 6. An exception to this requirement exists for "duly licensed" Native Americans who obtain cigarettes "for sale or use on the reservation in which they are an enrolled tribal member." PSR ¶ 11, at 6-7. When a business that sells cigarettes does not comply with this law, it has a cost advantage on cigarettes over other businesses in New Mexico. See PSR ¶ 11, at 7.

Rainbird and Ortiz were involved in several businesses that sold cigarettes to out-of-state customers and to customers not on Native American reservations. See PSR ¶¶ 10, 13, at 6-7. Rainbird controlled these businesses. See PSR ¶ 10, at 6. He organized them and supervised Ortiz. See PSR ¶ 52, at 16. An investigation revealed that, "from 2003 to 2008, Rainbird and Ortiz sold contraband cigarettes to approximately 6,000 out-of-state customers over the Internet without cigarette excise taxes being paid on those cigarettes and without reporting these sales to out-of-state tobacco tax administrators as required by the Jenkins Act," 15 U.S.C. §§ 375-78. PSR ¶ 13, at 7. During this time period, "Rainbird purchased approximately 826,048 cartons of cigarettes (165,209,740 cigarettes) at a purchase price totaling approximately $18,907,120.25, with a retail value of approximately $26,141,526.08." PSR ¶ 13, at 7. "On these Internet, contraband, off-Pueblo, tax-exempt cigarette sales, Rainbird realized a gross profit . . . of approximately $7,234,405.83." PSR ¶ 13, at 7. "This figure may be reduced downward to approximately $5,346,293.01 after costs of postage are taken into account." PSR ¶ 13, at 7. "The estimated tax loss to the State of New Mexico calculated during th[e] investigation was more than approximately

seven million five hundred thousand dollars ($7,500,000)." PSR ¶ 12, at 7. Rainbird and Ortiz were the two "authorized signers on the bank accounts where payments for orders through the web site" that facilitated these out-of-state sales "were deposited." PSR ¶ 19, at 8.

Other states and governmental entities challenged some of these businesses' practices. For instance, the City of New York brought a suit for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-1968, and Jenkins Act in City of New York v. Smokes-Spirits.Com, Inc., 541 F.3d 425 (2d Cir. 2008). See PSR ¶ 26, at 10. The Supreme Court of the United States ultimately heard some of the issues in that case from the United States Court of Appeals for the Second Circuit in Hemi Group, LLC v. City of New York, 130 S.Ct. 983 (2010). See PSR ¶ 26, at 10. ATF agents purchased cigarettes from one of Rainbird's business as part of their investigation. See PSR ¶ 30, at 11. During their investigation, they also observed through surveillance the delivery of a large number of cigarettes to one of Rainbird's businesses. See PSR ¶ 31, at 11.

## PROCEDURAL BACKGROUND

On October 8, 2009, a federal grand jury charged Rainbird and Ortiz in a fifty-nine count Indictment with the following: (i) Count 1: Conspiracy in violation of 18 U.S.C. § 371; (ii) Counts 2-9: Mail Fraud, in violation of 18 U.S.C. § 1341; (iii) Counts 10-33: Possession, Sale and Transport of Contraband Cigarettes, in violation of 18 U.S.C. § 2342(a); (iv) Counts 34-46: False Statement or Representation Regarding Cigarette Recordkeeping, in violation of 18 U.S.C. § 2342(b); (v) Counts 47-54: Engaging in Monetary Transactions Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957; (vi) Counts 55-59: Reports to State Tobacco Tax Administrator, in violation of 15 U.S.C. § 376; and (vii) Forfeiture in violation of 18 U.S.C. § 981(a)(1)(A) and (D), and 28 U.S.C. § 2461(a). See Indictment (Doc. 1).

On December 3, 2003, a grand jury, in a fifty-eight count superseding indictment, charged Rainbird and Ortiz with the following: (i) Count 1: Conspiracy in violation of 18 U.S.C. § 371; (ii) Counts 2-9: Mail Fraud, in violation of 18 U.S.C. § 1341; (iii) Counts 10-32: Possession, Sale and Transport of Contraband Cigarettes, in violation of 18 U.S.C. § 2342(a); (iv) Counts 33-45: False Statement or Representation Regarding Cigarette Recordkeeping, in violation of 18 U.S.C. § 2342(b); (v) Counts 46-53: Engaging in Monetary Transactions Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957; (vi) Counts 54-58: Reports to State Tobacco Tax Administrator, in violation of 15 U.S.C. § 376; (vii) Forfeiture in violation of 18 U.S.C. § 981(a)(1)(A) and (D), and 28 U.S.C. § 2461(c); and (viii) Forfeiture in violation of 18 U.S.C. § 982. See Superseding Indictment (Doc. 20). Before entering a guilty plea, Rainbird filed a motion to dismiss the Superseding Indictment. See Motion to Dismiss: Count 2-9, Mail Fraud; Count 10-32, Possession, Sale and Transport of Contraband Cigarettes; Counts 33-45, False Statement or Representation Regarding Cigarette Recordkeeping; Count 46-53, Engaging in Monetary Transaction Derived from Specified Unlawful Activity; Counts 54-58, Reports to State Tobacco Tax Administrator, filed February 14, 2011 (Doc. 82).

Rainbird, pursuant to a Plea Agreement, filed July 15, 2011 (Doc. 106), pled guilty to Count 32, Count 33, and Counts 54 through 58 of the Superseding Indictment. See Plea Agreement ¶ 3, at 2. Count 32 charged him with a violation of 18 U.S.C. § 2342(a), that being possession, sale and transport of contraband cigarettes. Count 33 charged him with a violation of 18 U.S.C. § 2342(b), that being false statement or representation regarding cigarette recordkeeping. Counts 54 through 58 charged him with a violation of 15 U.S.C. § 376 "as that section existed at the time of the charged conduct prior to the March 31, 2010 amendment," that being reports to state tobacco tax administrator. Plea Agreement ¶ 3, at 2. The parties "mutually acknowledge[d] that the offenses

alleged in Counts 32 and 33 are felonies and that" the offenses alleged in Counts 54 through 58 "are misdemeanors." Plea Agreement ¶ 3, at 2. The parties agreed that Rainbird would pay "a restitution amount of $94,500.00 of which the amount of $34,500.00 shall be made to the New Mexico Taxation and Revenue Department and of which the amount of $60,000.00 shall be made to the Pueblo de San Ildefonso." Plea Agreement ¶ 6, at 3-4. The parties agreed that Rainbird should receive a 3-level reduction to his base offense level under U.S.S.G. § 3E1.1 based on his acceptance of responsibility. See Plea Agreement ¶ 10, at 10-11. The parties reserved "their rights to assert any position or argument with respect to the sentence to be imposed." Plea Agreement ¶ 10, at 1.

The USPO disclosed a PSR for Rainbird on September 20, 2011. In the PSR, the USPO calculated Rainbird's total offense level to be 27. See PSR ¶ 57, at 17. The PSR calculated a base offense level of 26 under U.S.S.G. §§ 2E4.1(a)(2) and 2T4.1 based on the total amount of tax loss in this case -- approximately $7,500,000.00. See PSR ¶ 49, at 15-16. The PSR included a 2-level upward adjustment under U.S.S.G. § 3B1.1(c) based on Rainbird's role as a "leader, manager, supervisor and organizer of the offense." PSR ¶ 52, at 16-17. The PSR included a 2-level upward adjustment under U.S.S.G. § 3B1.3 based on Rainbird's abuse of position of trust as a "trusted tribal member" during the commission of his offenses. PSR ¶ 53, at 17. The PSR included a 3-level reduction under U.S.S.G. § 3E1.1 based on Rainbird's acceptance of responsibility. PSR ¶ 56, at 17. The PSR lists his criminal history category as I, based on 0 criminal history points. See PSR ¶ 60, at 18. The PSR calculated that an offense level of 27 and a criminal history category of I results in a guideline imprisonment range of 70 to 87 months. See PSR ¶ 100, at 27.

On September 30, 2011, the United States filed its Response to PSR. The United States contends that Rainbird should receive a 4-level enhancement under U.S.S.G. § 3B1.1(a) rather than a 2-level enhancement under U.S.S.G. § 3B1.1(c). See Response to PSR at 1. The United States

contends that Rainbird was the organizer or leader of criminal activity that was otherwise extensive, and thus should receive a 4-level enhancement. See Response to PSR at 1-2. The United States requests that the Court consider the cigarette sales to customers in its determination of who was involved in the criminal activity. See Response to PSR at 1-2. The United States also argues that the Court should take into account Rainbird's extensive use of postal services and the other individuals working for him when assessing whether to apply a 4-level enhancement. See Response to PSR at 2-3. The United States asserts that Rainbird also used an accounting firm, a variety of credit cards, and different banks to facilitate his criminal activity. See Response to PSR at 3. The United States also contends that Rainbird should receive a 2-level enhancement for abuse of position of trust with respect to Ortiz and for use of special skills in commission of the offenses. See Response to PSR at 3-4. The United States contends that Rainbird "was both a tribal Lieutenant Governor and a tribal judge of the Pueblo de San Ildefonso," positions which it argues gave Rainbird special skills under U.S.S.G. § 3B1.3. Response to PSR at 4. The United States argues that Rainbird abused a position of trust with respect to Ortiz. See Response to PSR at 4. It argues that he did so when he betrayed her trust in him as her uncle after she came to him and tried to get his attention regarding several notices of Jenkins Act violations, which "ultimately exposed her to criminal consequences." Response to PSR at 4. The United States asserts that Rainbird's conduct is particularly culpable based on his status at one time as "a tribal Lieutenant Governor and a tribal judge." Response to PSR at 4.

On September 30, 2011, Rainbird filed his Objections to PSR. Rainbird notes that he did not plead guilty to charges involving: (i) mail fraud; and (ii) engaging in monetary transactions derived from specified unlawful activity. See Objections to PSR at 4. Rainbird requests a sentence of 12-months home detention and 5-years probation to run consecutively with the 12-months home

detention.  See Objections to PSR at 4.  Rainbird asserts that he was actively involved in his community at the Pueblo de San Ildefonso and that he returned in 1975 from Los Angeles to help contribute to the Pueblo.  See Objections to PSR at 4.  He directs the Court to a large number of letters members of the Pueblo have sent to the Court in his support.  See Objections to PSR at 4-5. He notes that he helped establish certain health programs and services at the Pueblo.  See Objections to PSR at 5.  He directs the Court to a letter from B. Scott Nelson, a friend of Rainbird who helped Rainbird run some programs on the Pueblo, who acknowledges that Rainbird has helped domestic violence victims, has helped those suffering from gambling and alcohol addictions, has fought for women's voting rights on the Pueblo, and has helped counsel some of the youth in the tribe on their career path.  See Objections to PSR at 5.  Rainbird notes that he was a member of the Board of Regents for the New Mexico State museums and the "Director of the Southwestern Association for Indian Affairs in Santa Fe that puts on the Indian Market."  Objections to PSR at 5.  Rainbird objects to the PSR's application of a role enhancement for abuse of position of trust under U.S.S.G. § 3B1.3. See Objections to PSR at 6-7.  Rainbird also objects to the United States' request that he receive an enhancement for abuse of position of trust with respect to his interactions with Ortiz and for use of a special skill in the commission of the offenses.  See Objections to PSR at 7.  Rainbird also requests a variance to the equivalent of an offense level of 10, which he asserts would result in a guideline imprisonment range of 10 to 12 months.  See Objections to PSR at 8.  Rainbird asserts that he already faces the burden of returning to his Pueblo as a felon and that he will lose many rights based on his status as a felon.  See Objections to PSR at 14.  Rainbird asserts that he and Ortiz were not aware that their conduct violated the law.  See Objections to PSR at 14.  He notes that the illegality of their business was not clear.  See Objections to PSR at 14-15.

On October 11, 2011, the United States filed its Amended Response of the United States to

Defendant's Sentencing Memorandum.  See Doc. 120 ("Response to Sentencing Memorandum"). The United States opposed Rainbird's sentencing requests.   See Response to Sentencing Memorandum at 1.  The United States contends that Rainbird cannot genuinely claim he was unaware his conduct violated the law when he received various notices of Jenkins Act violations. See Response to Sentencing Memorandum at 2.  The United States notes that several of the criminal statutes that Rainbird violated are strict liability offenses.   See Response to Sentencing Memorandum at 3.  The United States asserts that Rainbird received a large amount of profits from his criminal activity, which he used for his own personal expenses and to live a lavish lifestyle.  See Response to Sentencing Memorandum at 4.  The United States asserts that Rainbird should receive a lengthier sentence than Ortiz, who it argues acted in a much more blameless manner than Rainbird and whose role was minor compared to Rainbird's.  See Response to Sentencing Memorandum at 8-9.  The United States requests a sentence of 5-years imprisonment.  See Response to Sentencing Memorandum at 9.

On October 6, 2011, the USPO disclosed an Addendum to the Presentence Report ("Addendum to PSR").  This Addendum to PSR responds to the United States' and Rainbird's objections to the PSR.  Regarding the United States' objection that a 4-level enhancement should apply under U.S.S.G. § 3B1.1, the USPO disagrees that it should apply.  See Addendum to PSR at 1-2.  It notes that Rainbird was significantly more culpable than any of the other participants, including Ortiz.  See Addendum to PSR at 2.  The USPO concedes that other entities, such as the United States Postal Service, played a role in the criminal activity.  See Addendum to PSR at 2.  It notes, however, that "it is unclear if the entities were needed to facilitate the offense."  Addendum to PSR at 2.  With respect to Rainbird's objection that a 2-level enhancement for use of a special skill under U.S.S.G. § 3B1.3 should not apply, the USPO disagrees with the objection.  See

Addendum to PSR at 3.  It notes that Rainbird's use of his position in the tribe enabled him to commit this offense.  <u>See</u> Addendum to PSR at 3.  The USPO reiterates that he used his good standing in the tribe to mislead the businesses that provided him with cigarettes that did not contain a tax-paid stamp.  <u>See</u> Addendum to PSR at 3.

At the sentencing hearing on October 14, 2011, the United States reiterated the size of Rainbird's criminal operations by pointing out that Rainbird had over 6,000 customers. <u>See</u> Transcript of Hearing at 3:21-4:3 (taken October 14, 2011)(Spiers)("Tr.").[2]  The Court questioned whether it should consider the use of banks and credit cards in determining whether criminal activity was otherwise extensive.  <u>See</u> Tr. at 4:4-12 (Court).  The Court noted that the United States Court of Appeals for the Tenth Circuit has affirmed decisions applying this otherwise extensive criminal activity enhancement in cases where the criminal activity was not likely as extensive as the activity in this case.  <u>See</u> Tr. at 5:2-22 (Court).  The United States asserted that Rainbird's business made sales to customers in a variety of different states and to customers in different countries.  <u>See</u> Tr. at 6:5-10 (Spiers).  The Court questioned how much control Rainbird had over some of these unknowing participants.  <u>See</u> Tr. at 6:11-7:7 (Court).  Rainbird emphasized that activities such as using an American Express card should not support an enhancement of this nature.  <u>See</u> Tr. at 8:5-15 (Winder).  Rainbird argued that the Court has discretion on this issue. <u>See</u> Tr. at 9:9-18 (Winder).  Rainbird stated that he did not have any objection to the application of the 2-level enhancement based on his role as a leader or organizer instead of the 4-level enhancement.   <u>See</u> Tr. at 9:25-10:5 (Court, Winder).  The United States contended that an enhancement for abuse of trust should apply, because Rainbird used the unknowing Pueblo to

---

[2]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

facilitate his criminal conduct.  See Tr. at 17:2-11 (Spiers).  The United States noted that it was not

seeking any enhancement for obstruction of justice or similar conduct.  See Tr. at 14:16-22 (Spiers).

The United States argued that Rainbird's position as a lieutenant governor and tribal judge both

allowed him to abuse a position of trust and gave him special skills to facilitate his criminal conduct.

See Tr. at 23:8-17 (Spiers).  The United States also noted that Rainbird is a generation older than

Ortiz and is also her uncle.  See Tr. at 23:10-13 (Spiers).  It contended that those circumstances as

well as his special skills allowed him to abuse a position of trust with her.  See Tr. at 23:8-17

(Spiers).  The United States noted that Rainbird could not have engaged in this criminal activity

without representing that he was a tribal member in good standing.  See Tr. at 23:22-24:2 (Spiers).

Rainbird argued that, by pleading guilty, he has avoided bringing his Pueblo into this dispute and

has saved them a great deal of internal strife.  See Tr. at 25:2-25 (Winder).  Rainbird stated that he

would never manipulate his niece.  See Tr. at 31:8-11 (Rainbird).  Rainbird emphasized how many

letters people had sent in to support him.  See Tr. at 41:18-21 (Winder).  Rainbird also asked the

Court to consider that he has agreed to pay $95,000.00 in restitution and that it will be difficult for

him to pay that amount if he faces lengthy incarceration.  See Tr. at 48:7-17 (Winder).  Rainbird also

emphasized the poor conditions on Native American reservations with respect to issues like

education and unemployment, and how he has tried to help fix those problems.  See Tr. at 52:23-

53:17 (Rainbird).  With respect to the issue of restitution, the Court inquired about whom the victims

in the case were.  See Tr. at 67:13-16 (Court).  The United States argued that the victims would be

the various jurisdictions deprived of tax revenue and the Pueblo de San Ildefonso.  See Tr. at 67:17-

20 (Spiers).  The United States asserted that a sentence in the range of 2- to 4-years imprisonment

would be appropriate.  See Tr. at 70:6-15 (Spiers).

## LAW REGARDING THE JENKINS ACT

15 U.S.C. § 376 provides:

(a)      Contents. Any person who sells, transfers, or ships for profit cigarettes or smokeless tobacco in interstate commerce, whereby such cigarettes or smokeless tobacco are shipped into a State, locality, or Indian country of an Indian tribe taxing the sale or use of cigarettes or smokeless tobacco or who advertises or offers cigarettes or smokeless tobacco for such sale, transfer, or shipment, shall --

   (1)   first file with the Attorney General of the United States and with the tobacco tax administrators of the State and place into which such shipment is made or in which such advertisement or offer is disseminated a statement setting forth his name and trade name (if any), and the address of his principal place of business and of any other place of business, as well as telephone numbers for each place of business, a principal electronic mail address, any website addresses, and the name, address, and telephone number of an agent in the State authorized to accept service on behalf of the person;

   (2)   not later than the 10th day of each calendar month, file with the tobacco tax administrator of the State into which such shipment is made, a memorandum or a copy of the invoice covering each and every shipment of cigarettes or smokeless tobacco made during the previous calendar month into such State; the memorandum or invoice in each case to include the name and address of the person to whom the shipment was made, the brand, the quantity thereof, and the name, address, and phone number of the person delivering the shipment to the recipient on behalf of the delivery seller, with all invoice or memoranda information relating to specific customers to be organized by city or town and by zip code; and

   (3)   with respect to each memorandum or invoice filed with a State under paragraph (2), also file copies of the memorandum or invoice with the tobacco tax administrators and chief law enforcement officers of the local governments and Indian tribes operating within the borders of the State that apply their own local or tribal taxes on cigarettes or smokeless tobacco.

15 U.S.C. § 376. Before March 31, 2010, violations of this provision were misdemeanors. See Act of Oct. 19, 1949, ch. 699, § 3, 63 Stat. 884, 885 (codified as amended at 15 U.S.C. § 375-78)("Whoever violates the provisions of this Act shall be guilty of a misdemeanor and shall be fined

not more than $1,000 or imprisoned not more than six months or both.").  On March 31, 2010,

Congress amended the Jenkins Act, making violations of this act a felony.  <u>See</u> Prevent All Cigarette

Trafficking Act of 2009, Pub. L. No. 111-154, § 2(d), 124 Stat. 1087, 1100 (2010)(codified at 15

U.S.C. § 377).  <u>See</u> 15 U.S.C. § 377 ("Except as provided in paragraph (2), whoever knowingly

violates this Act shall be imprisoned for not more than 3 years, fined under title 18, United States

Code, or both.").

### <u>LAW REGARDING U.S.S.G. § 3B1.3</u>

U.S.S.G. § 3B1.3, entitled "Abuse of Position of Trust or Use of Special Skill," provides:

> If the defendant abused a position of public or private trust, or used a special skill,
> in a manner that significantly facilitated the commission or concealment of the
> offense, increase by 2 levels.  This adjustment may not be employed if an abuse of
> trust or skill is included in the base offense level or specific offense characteristic.
> If this adjustment is based upon an abuse of a position of trust, it may be employed
> in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is
> based solely on the use of a special skill, it may not be employed in addition to an
> adjustment under § 3B1.1 (Aggravating Role).

U.S.S.G. § 3B1.3.  Application Note 1 defines "Public or Private Trust," and explains:

> "Public or private trust" refers to a position of public or private trust characterized
> by professional or managerial discretion (i.e., substantial discretionary judgment that
> is ordinarily given considerable deference).   Persons holding such positions
> ordinarily are subject to significantly less supervision than employees whose
> responsibilities are primarily non-discretionary in nature.  For this adjustment to
> apply, the position of public or private trust must have contributed in some
> significant way to facilitating the commission or concealment of the offense (<u>e.g.</u>,
> by making the detection of the offense or the defendant's responsibility for the
> offense more difficult).  This adjustment, for example, applies in the case of an
> embezzlement of a client's funds by an attorney serving as a guardian, a bank
> executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a
> physician under the guise of an examination.  This adjustment does not apply in the
> case of an embezzlement or theft by an ordinary bank teller or hotel clerk because
> such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3 cmt. n.1.  Application note 4 defines "Special skill" as "a skill not possessed by

members of the general public and usually requiring substantial education, training or licensing.

-13-

Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."

U.S.S.G. § 3B1.3 cmt. n.4.  The United States must satisfy two elements to meet § 3B1.3,

establishing: (i) the defendant possessed a special skill or a position of trust; and (ii) the defendant

used that skill or abused that position to significantly facilitate the commission or concealment of

the offense.  See United States v. Burt, 134 F.3d 997, 998-99 (10th Cir. 1998).

The Tenth Circuit has explained that "position of trust is a bit of a misnomer.  It actually has

little to do with trustworthiness and everything to do with authority and discretion."  United States

v. Burt, 134 F.3d at 1154 (emphasis in original)(internal quotation marks omitted).  Thus, "the lack

of any authority to make substantial discretionary judgments is key in determining whether the

enhancement applies."  United States v. Spear, 491 F.3d 1150, 1154 (10th Cir. 2007)(internal

quotation marks omitted).

Because U.S.S.G. § 3B1.1 is concerned with persons abusing their lack of supervision to

commit or conceal wrongdoing, "it is reserved for those with professional or managerial discretion."

United States v. Spear, 491 F.3d at 1154.  That authority involves "substantial discretionary

judgment."  United States v. Spear, 491 F.3d at 1154 (emphasis in the original).  A sentencing court

> must undertake a functional analysis of job responsibilities and examine whether
> those duties were merely ministerial or were, in fact, managerial.  Indications of
> substantial discretionary judgment under the § 31B1.3 enhancement include the
> authority to engage in case-by-case decisionmaking, to set policies, and to grant
> exceptions to governing policies or protocols.  These factors are a [sic]
> nonexhaustive, and no one factor is dispositive of the analysis.

United States v. Spear, 491 F.3d at 1155.  Morever, even if a defendant "occupies a position of

trust," the court must "determine if the position was used in a manner that significantly facilitated

the commission or concealment of the offense."  United States v. Spear, 491 F.3d at 1155 (internal

quotations omitted).

-14-

In <u>United States v. Spear</u>, the Tenth Circuit determined that enhancement under U.S.S.G. § 3B1.3 was inappropriate.  The defendant, a federal immigration employee responsible for intake of applications for changes in status, embezzled application fees by depositing the fees into her personal account. The Tenth Circuit found that "her theft was accomplished by being in the right place at the right time, i.e., opportunity and access, not by exercising the cloak of authority to stave off inquiry or decision-making power to cover her tracks." <u>United States v. Spear</u>, 491 F.3d at 1156-59.

In <u>United States v. Edwards</u>, 325 F.3d 1184 (10th Cir. 2003), the Tenth Circuit explained that courts should not apply the U.S.S.G. § 3B1.3 enhancement in every employee fraud or embezzlement case.  <u>See</u> <u>id</u>. at 1187.  Thus, according to the Tenth Circuit in <u>United States v. Edwards</u>, that an employee "was trusted by her employer with significant responsibility -- even to the point of allowing her to bypass usual accounting controls and pick up customer checks from incoming mail -- is not determinative." <u>Id</u>.  The defendant in <u>United States v. Edwards</u> mostly handled accounts receivable and diverted customer payments into her boyfriend's account. <u>See</u> <u>id</u>. at 1185-86.   The enhancement was inapplicable to the defendant in <u>United States v. Edwards</u>, because her work was ministerial and clerical. <u>See</u> <u>id</u>.  The Tenth Circuit rejected the United States' argument that the defendant had "alleged specialized accounting skills, . . . minimal oversight, [and] . . . virtually exclusive control over the accounts receivable and customer billing records," and that she "use[d] . . .  her position to conceal [her offense]." <u>Id</u>. at 1187.

The Tenth Circuit has generally applied the U.S.S.G. § 3B1.3 enhancement in two categories of cases:  (i) "where employees abuse their position within their own organization to take advantage of the employer, and" (ii) "where someone uses a fiduciary or personal trust relationship to perpetrate the charged offense against the beneficiary of the trust." <u>United States v. Evans</u>, 44

F.App'x 449, 453 (10th Cir. 2002)(unpublished).  In United States v. Evans, the defendants ran an organization that recruited day-care providers to provide meals to underprivileged children.  See id. at 450.  The Utah State Office of Education received federal funds, and dispensed them to the defendant's organization to cover overhead and administrative costs.  See id. at 451.  The organization was responsible for recruiting the providers and disbursing payment to them.  See id. The defendants submitted fraudulent paperwork seeking reimbursements for meals not served or for providers no longer with the program, listed incorrect addresses for providers, and demanded that some providers give them kickbacks from reimbursement checks.  See id.  The Tenth Circuit held that enhancement under U.S.S.G. § 3B1.3 was appropriate, because the defendants "exercised considerable control and maintained considerable independence, despite some regulatory oversight." Id. at 453.  The Tenth Circuit noted that the providers were not given funds in advance to give meals to the children, but instead were reimbursed for meals provided during the previous month.  See id. "Defendants received the funds that they were to use to reimburse providers.  This placed defendants in a personal trust relationship with the providers, and the defendants' demands for kickbacks abused that trust and deprived the providers of reimbursement funds."  Id.

    In United States v. Pappert, the Tenth Circuit found that the defendant had a position of trust with his customers, because he "gained a position of trust with respect to the customers that enabled him to conceal his fraud for long periods of time." 112 F.3d at 1080.  There is no "bright line between formal or informal fiduciary relationships, and run-of-the-mill commercial relationships." United States v. Pappert, 112 F.3d at 1080.  The court must "carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on [the] defendant's position in the transaction."  United States v. Pappert, 112 F.3d at 1080 (internal quotation marks omitted).

-16-

In United States v. Pappert, the Tenth Circuit determined that the enhancement was applicable, because:

> In isolation, each one of his lease agreements might appear to be a standard commercial transaction, executed at arm's length. However, when [the defendant's] acts are considered in the aggregate, it appears that he created a position of trust . . . . In this manner, by virtue of his role as middleman between customer and financing source, he gained a position of trust with respect to the customers that enabled him to conceal his fraud for long periods of time.

112 F.3d at 1080.  See United States v. Queen, 4 F.3d 925, 929 (10th Cir. 1993)(explaining that the defendant occupied a position of trust when he held himself out as an investment advisor/broker, because that position "is typically [filled by] an individual who is entrusted with the discretionary authority to manage the assets of his or her clients through the application of specialized knowledge.").

The enhancement is not authorized when the elements of the underlying offense include abuse of a position of trust.  As the Tenth Circuit explained in United States v. Chimal, 976 F.2d 608 (10th Cir. 1992):

> An ordinary bank teller, who steals from the till and adjusts the records, is not subject to the abuse of trust enhancement because the job is not considered a position of trust.  Unlike a bank teller, Defendant as comptroller held a position of trust.  She essentially had complete control over the accounting department and rarely had to report her activities to a superior.

976 F.3d at 613-14.  "[E]mbezzlement by definition involves an abuse of trust."  United States v. Chimal, 976 F.2d at 613 & n.5 ("Embezzlement involves the fraudulent appropriation to his own use or benefit, of property or money entrusted to [an individual] by another, by a clerk, agent, trustee, public officer, or other person acting in a fiduciary character." (alteration in the original)(internal quotations marks omitted)).

In United States v. Burt, the Tenth Circuit did not address whether knowledge of narcotics

agents, surveillance techniques the agents used, and the methods the agents used to orchestrate controlled buys qualified as special skills, because "the use of those skills to significantly facilitate the commission or concealment of the offense, c[ould] not be met on the[] facts." 134 F.3d at 1000. The Tenth Circuit stated: "There is no evidence in the record to support a finding that Defendant actually used his knowledge of narcotics detection techniques to significantly facilitate the concealment of his crime." Id. On the contrary, "the evidence in the record [was] that rather than attempting to conceal his crime, when law enforcement officers knocked at his door, he directed them to the garage to search his car for the cocaine." Id. The Tenth Circuit stated that it could not affirm a section 3B1.3 enhancement for use of a special skill "[w]ithout the requisite connection between the crime and Defendant's special knowledge." Id. The Tenth Circuit thus vacated the district court's sentence. See id.

In United States v. Atkin, 107 F.3d 1213 (6th Cir. 1997), the United States Court of Appeals for the Sixth Circuit addressed the defendant's argument that "the district court erred in enhancing his sentence on Counts 1 through 9 based on a finding that he had used his skill as a lawyer to facilitate commission or concealment of the offense." 107 F.3d at 1219. Atkins was charged with obtaining money from a client -- Reuben Sturman -- "by falsely representing that he, Atkin, would bribe the United States District Judge presiding over Sturman's criminal case." Id. at 1215. The district court found

> that Sturman selected Atkin in his attempt to gain more favorable treatment not only because Atkin had a friendship with the district judge but also because Atkin was a lawyer. The district court also relied on testimony indicating that Atkin had asked the district judge "whether or not anything could be done for Mr. Sturman." Finally, the district court relied on testimony indicating that Atkin instructed Sturman to send the purported bribe money to Atkin's trust account.

Id. at 1220. The Sixth Circuit concluded that the district court properly applied U.S.S.G. § 3B1.3.

-18-

See id.

> Although, as we have already noted in Part II.B. above, Atkin was unsuccessful in getting the district judge to engage in an ex parte discussion of Sturman's case, the ostensible normalcy of his visit to chambers could well have precluded further inquiry from the district judge or any other person who might have been suspicious regarding Atkin's entry into chambers. The evidence strongly indicates that Atkin was well aware that he could use his position and skills as an attorney to conceal the true nature of his actions, and the evidence further supports a finding that he did precisely that. In November, 1991 Atkin sent a bogus letter to Reuben Sturman purporting to offer his services in pursuit of a claim of ineffective assistance of counsel. In the letter, Atkin stated that "[m]y fee to research and develop that will be $250,000." Although Atkin ultimately accepted a total of $550,000 from Reuben Sturman, he never filed any pleading, motion, or brief on the latter's behalf in any court, nor did he ever make any official court appearance, apart from the ex parte visit to the district judge on behalf of Reuben Sturman.

Id. (footnote omitted). The Sixth Circuit thus found that the district court's "finding that Atkin used his skill as a lawyer in a manner justifying application of § 3B1.3 [wa]s not clearly erroneous." Id.

In United States v. Kubick, 205 F.3d 1117 (9th Cir. 1999), the United States Court of Appeals for the Ninth Circuit affirmed the district court's application of U.S.S.G. § 3B1.3. See 205 F.3d at 1125. The Ninth Circuit stated: "As an attorney, Herron qualifies as 'specially skilled,' U.S.S.G. § 3B1.3, Application Note 3, and his license to practice law enabled him easily and inconspicuously to create shell corporations so that Kubick [-- another defendant --] could deceive the bankruptcy court by secreting assets." Id.

## LAW REGARDING U.S.S.G. § 3B1.1(a)
## AGGRAVATING-ROLE ENHANCEMENTS

U.S.S.G. § 3B1.1 provides for enhancements to a defendant's offense level based on a defendant having played an aggravating role in the offense. Under § 3B1.1(a), "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." U.S.S.G. § 3B1.1(a). A district court's finding whether a defendant's criminal activity involved five or more participants or, in the alternative, that the

operation was otherwise extensive is a finding of fact which the Tenth Circuit reviews under the clearly erroneous standard.  See United States v. Yarnell, 129 F.3d 1127, 1139 (10th Cir. 1997). Lesser enhancements are specified for defendants who are "managers or supervisors" rather than organizers or leaders, and for defendants involved in smaller-scale criminal conduct. U.S.S.G. § 3B1.1(b)-(c).  "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1, cmt. n.1.

"Neither the Guidelines nor the cases interpreting § 3B1.1 provide a precise definition of 'otherwise extensive.'"  United States v. Yarnell, 129 F.3d at 1139.  "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered."  U.S.S.G. § 3B1.1, cmt. n.3.  "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility."  U.S.S.G. § 3B1.1 cmt. backg'd.

Among the factors a sentencing court should consider when weighing an aggravating-role enhancement are:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1 cmt. n.4.  The Tenth Circuit has "elaborated that '[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures.'"  United States v. Sallis, 533 F.3d at 1223 (quoting United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)).  The

-20-

Tenth Circuit accepted the following definition of "otherwise extensive":

> [T]he sentencing court is free to consider the use of unwitting outsiders in determining if a criminal enterprise is "extensive" within the contemplation of section 3B1.1. . . . The extensiveness of a criminal activity is not necessarily a function of the precise number of persons, criminally culpable or otherwise, engaged in the activity. Rather, an inquiring court must examine the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme.

United States v. Yarnell, 129 F.3d at 1139 (alteration in original).  For example, the Tenth Circuit found a 4-level enhancement appropriate "for a defendant who led a drug conspiracy that involved less than five participants but that supplied hundreds of customers over a three-week period." United States v. Yarnell, 129 F.3d at 1139.  The Tenth Circuit also found a 4-level enhancement appropriate in a case where "[t]he fraudulent enterprise . . . spread from Denver to Phoenix, St. Louis and Atlanta" that "lasted four months, created at least 40 victims, and generated losses in excess of $140,000," and "involved considerable planning and complex execution, and included at least one other culpable participant as well as a number of other participants who may not have been culpable."  United States v. Yarnell, 129 F.3d at 1139.

While there is overlap between the activities that would make a defendant a leader and those that would make a defendant an organizer, the two are distinct.  "Nothing in the Guidelines requires that an organizer must exercise some direction or control over underlings." United States v. Valdez-Arieta 127 F.3d 1267, 1271 (10th Cir. 1997).  "As a result, a defendant may be punished as an organizer under § 3B1.1(c)[3] for devising a criminal scheme, providing the wherewithal to

---

[3]Section 3B1.1(c) applies to leaders, organizers, managers, or supervisors of organizations with less than five persons.  The only relevant difference between an organizer under § 3B1.1(a) and an organizer under § 3B1.1(c), it seems, is the size of the organization.  The Tenth Circuit "interpret[s] the Sentencing Guidelines according to accepted rules of statutory construction." United States v. Nacchio, 573 F.3d 1062, 1066 (10th Cir. 2009).  "[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning."  IBP, Inc. v. Alvarez,

accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." United States v. Valdez-Arieta, 127 F.3d at 1272.

## RELEVANT RULES OF STATUTORY CONSTRUCTION

The Tenth Circuit "interpret[s] the Sentencing Guidelines according to accepted rules of statutory construction." United States v. Nacchio, 573 F.3d 1062, 1066 (10th Cir. 2009). As the Supreme Court of the United States has recognized: "Statutory construction must begin with the language employed by [the writer] and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985). When a statute includes a term with a particular legal meaning based on prior precedent, courts presume that the drafter of the statute intended the term to have that particular legal meaning. See Clay v. United States, 537 U.S. 522, 527 (2003). In determining the meaning of a statute, courts look to the statute as a whole. See United States v. Atlantic Research Corp., 551 U.S. 128, 135 (2007). When a statute includes particular language in one section of a statute, but omits it in another section of the same act, courts generally presume that the drafter of the statute acted intentionally and purposefully by including the language in one provision and omitting it from another. See Burlington N. & Santa Fe. Ry. Co. v. White, 548 U.S. 53, 62-63 (2006). Lastly, courts must strive to interpret a statute so that it gives every word in that statute operative effect. See United States v. Nordic Vill., Inc., 503 U.S. 30, 35 (1992).

## LAW REGARDING 18 U.S.C. § 3663

18 U.S.C. § 3663 authorizes a district court to require a defendant to pay restitution to

---

546 U.S. 21, 34 (2005).

victims under some circumstances.  See 18 U.S.C. § 3663(a).  18 U.S.C. § 3663(a)(1) sets out certain offenses for which a district court may require restitution to a victim.  See 18 U.S.C. § 3663(a)(1). 18 U.S.C. § 3663(a)(3) provides that a district court "may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement."  18 U.S.C. § 3663(a)(3).  This provision authorizes a sentencing judge to award restitution in an amount greater than the loss relating to the offense of conviction.  See United States v. Schrimsher, 58 F.3d 608, 610 (11th Cir. 1995)("We join these circuits and hold that [18 U.S.C. § 3663(a)(3)] gives the sentencing judge discretion to order restitution in an amount greater than the loss relating to the offense of conviction when the parties have assented to such restitution in a plea agreement.").  "Under 3663(a)(3)," a "district court can only order restitution to the extent agreed upon in the plea agreement."  United States v. Guthrie, 64 F.3d at 1515.  If the defendant does not stipulate to an amount of restitution to be paid under the plea agreement, a district court must "determine the appropriate amount in accordance with the provisions of 18 U.S.C. § 3664."  United States v. Guthrie, 64 F.3d at 1515.  "Appellate review of the legality of a restitution award is de novo, while the amount of restitution is reviewed for an abuse of discretion."  United States v. Diamond, 969 F.2d 961, 965 (10th Cir. 1992).

## ANALYSIS

Because the Court does not conclude that Rainbird held a position of trust or abused any position of trust he held, the Court will not apply a 2-level enhancement under U.S.S.G. § 3B1.3. Because Rainbird possessed no special skills, the Court will not apply a 2-level enhancement under U.S.S.G. § 3B1.3.  Because Rainbird was not the leader or organizer of otherwise extensive criminal activity, the Court will not apply a 4-level enhancement under U.S.S.G. § 3B1.1.  Because the parties have stipulated to an amount of $94,500.00 in restitution, the Court will accept the stipulation and order Rainbird to pay this amount in restitution pursuant to the stipulation.  The Court will

downwardly vary from a guideline range of 57 to 60 months to a sentence of 33 months.

**I.      RAINBIRD DID NOT ABUSE A POSITION OF TRUST WHILE COMMITTING THE OFFENSES.**

The United States must satisfy two elements to meet U.S.S.G. § 3B1.3, establishing: (i) the defendant possessed a special skill or a position of trust; and (ii) the defendant used that skill or abused that position to significantly facilitate the commission or concealment of the offense. See United States v. Burt, 134 F.3d 997, 998-99 (10th Cir. 1998).  The Tenth Circuit has generally applied the U.S.S.G. § 3B1.3 enhancement for abuse of a position of trust in two categories of cases: (i) "where employees abuse their position within their own organization to take advantage of the employer, and" (ii) "where someone uses a fiduciary or personal trust relationship to perpetrate the charged offense against the beneficiary of the trust."  United States v. Evans, 44 F.App'x at 453. There is no "bright line between formal or informal fiduciary relationships, and run-of-the-mill commercial relationships." United States v. Pappert, 112 F.3d at 1080.  Courts must "carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on [the] defendant's position in the transaction."  United States v. Pappert, 112 F.3d at 1080 (internal quotations omitted).

**A.      RAINBIRD DID NOT ABUSE A POSITION OF TRUST WHEN HE USED HIS STATUS AS A TRIBAL MEMBER IN GOOD STANDING TO PURCHASE CIGARETTES.**

The PSR details that, during the commission of the offense, Rainbird sent letters to businesses stating that he was a member in good standing of the Pueblo de San Ildefonso.  See PSR ¶ 53, at 17.  The PSR notes that an exception to the law regarding cigarette taxes applies "for Native Americans, duly licenced, who obtain cigarettes for sale or use on the reservation in which they are

-24-

an enrolled tribal member." PSR ¶ 53, at 17.  The PSR concludes that, if not for Rainbird's position as a trusted tribal member, he could not have purchased the cigarettes with the tax exemption.  See PSR ¶ 53, at 17.

There are no indications, however, that being a trusted tribal member involves "professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."  U.S.S.G. § 3B1.3 cmt. n.1.  While it is possible that being a trusted tribal member could qualify as a position of public or private trust for purposes of this guideline, that would require more than just being a trusted tribal member, such as evidence demonstrating that the person "had significant managerial responsibility, the elected tribal treasurers relied on the accuracy of the information they provided, and the abuse of trust contributed in a significant way to facilitating the commission and concealment of the offenses."  United States v. Goings, 313 F.3d 423, 427-28 (8th Cir. 2002).  Furthermore, this guideline enhancement would more likely apply when a defendant with a position of trust within the tribe used that position to abuse the tribe itself rather than outsiders, such as the companies here from which Rainbird purchased cigarettes, as the relationship with the tribe would constitute a closer relationship more akin to a fiduciary relationship.  See United States v. Goings, 313 F.3d at 425, 427-28 (applying this enhancement when the charged conduct included theft from an "Indian tribal organization in violation of 18 U.S.C. § 1163 and one count of conspiracy to commit theft from an Indian tribal organization in violation of 18 U.S.C. § 371 ").  The United States and the USPO provide no detail regarding the harm Rainbird caused to his tribe or the nature of the responsibilities that come with a position as a trusted tribal member -- both of which would help the Court determine whether Rainbird held a position of trust and abused that position of trust.  While it is true that part of the relevant conduct of the offenses occurred in 2008, when the defendant was acting as a tribal Lieutenant Governor,

there is no indication that Rainbird used this position to further any criminal activity.  See PSR ¶¶ 15-19, at 7-8; Addendum to PSR at 3.

Even assuming that a position of a trust existed, the PSR does not provide any detail regarding how Rainbird perpetrated any of the charged crimes against his tribe or the nature of the harm they suffered.  The PSR provides no details as to Rainbird's tribe relying on him as it relates to the conduct underlying this offense.  The Tenth Circuit applies the U.S.S.G. § 3B1.3 enhancement for abuse of a position of trust in two categories of cases:  (i) "where employees abuse their position within their own organization to take advantage of the employer, and" (ii) "where someone uses a fiduciary or personal trust relationship to perpetrate the charged offense against the beneficiary of the trust."  United States v. Evans, 44 F.App'x at 453.  There are no charges that Rainbird committed any criminal conduct against the tribe, who would be the beneficiary of the trust relationship -- assuming one exists.  While the tribe may be a victim in some sense of the word, the PSR focuses in its discussion of Rainbird's crimes on losses to state tax authorities as opposed to any other victims.  There is no indication Rainbird had any relationship akin to a fiduciary relationship with those entities.

With respect to the businesses from which Rainbird purchased cigarettes, nothing in the PSR indicates that Rainbird established a "fiduciary or personal trust relationship" with any of these businesses to which he sent these letters.  United States v. Evans, 44 F.App'x at 453.  "[A] mere showing that the victim had confidence in the defendant" is not sufficient under this guidelines. United States v. Brunson, 54 F.3d 673, 678 (10th Cir. 1995).  "Something more akin to a fiduciary function is required."  United States v. Brunson, 54 F.3d at 678.  No facts here indicate that Rainbird established any such relationship akin to a fiduciary function with these businesses.  See United States v. Brunson, 54 F.3d at 678.  Any harm these businesses who sold Rainbird cigarettes suffered

resulted from their failure to corroborate Rainbird's assertions as opposed to an abuse of position of trust. The United States had not met its burden to prove that this enhancement applies. See United States v. Manatau, 647 F.3d 1048, 1054 n.2 (10th Cir. 2011)(noting that the preponderance-of-the-evidence standard applies during sentencing).

### B.    RAINBIRD DID NOT ABUSE A POSITION OF TRUST IN HIS INTERACTIONS WITH ORTIZ.

The United States also argues that Rainbird abused a position of trust with respect to his niece and co-defendant, Ortiz, who joined the business as a family member, part-time out of college. See Response to PSR at 3-4. The United States points out that Ortiz is approximately 20 years younger than Rainbird. See Response to PSR at 4. The United States also emphasizes that Rainbird told Ortiz that the notices they had received regarding taxes did not apply to their organization and that he instructed her to keep the letters in a file. See Response to PSR at 4. The United States contends that she trusted Rainbird's guidance on these matters pertaining to the business and other major decisions. See Response to PSR at 4. The United States contends that this abuse of trust makes him more culpable, because Rainbird was once a Lieutenant Governor and a tribal judge, and that he never sought a legal opinion or legal advice from an attorney, any New Mexico agency, or the New Mexico Attorney General. See Response to PSR at 4.

Rainbird counters that these arguments lack merit. See Objections to PSR at 7. Rainbird points out that the United States provided Ortiz with a favorable sentence out of fear that a jury might believe that Ortiz and Rainbird had no intent to commit mail fraud or money laundering. See Objections to PSR at 7. He argues there is no factual support in the record to support the United States' claims. See Objections to PSR at 7.

The United States' arguments regarding Rainbird's abuse of a position of trust with respect

-27-

to Ortiz are not persuasive.  A "'nonbusiness, purely familial' relationship" does not normally justify an enhancement for abuse of position of trust.  United States v. Shevi, 345 F.3d 675, 679-80 (8th Cir. 2003)(quoting United States v. Willard, 230 F.3d 1093, 1097 (9th Cir. 2000)).  As the United States Court of Appeals for the Third Circuit has explained, amendments to the application notes to U.S.S.G. § 3B1.3 have made it clear that standard familial relationships do not fall within the contemplation of the guideline:

> The application notes to the 1988 version of U.S.S.G. § 3B1.3 are not entirely clear, but their overall tenor appears to encompass the relationship of employer and employee, not parent and child.  Any doubt is resolved by reference to the 1993 application notes, which define a position of public or private trust as involving "professional or managerial discretion."  No mention is made at all of nonbusiness positions of trust.  Moreover, likening the criminalization of a child to an abuse of trust misrepresents the rationale behind the section 3B1.3 enhancement, which is that a person who uses a special position of trust to commit a crime is likely to be more difficult to apprehend and prosecute than the average criminal.  Employing one's child in a criminal scheme generally does not make concealment of the offense itself any easier.

United States v. Monaco, 23 F.3d 793, 800-01 (3d Cir. 1994)(footnote omitted)(citations omitted).  As the United States Court of Appeals for the Eighth Circuit recognized, an enhancement under this provision may be justified for an abuse of trust involving other family members when additional facts distinguish that relationship and make it more akin to a fiduciary relationship.  See United States v. Shevi, 345 F.3d at 680.  For example, an enhancement was justified when an uncle "served as trustee of social security benefits received by his minor niece and nephew," because "[h]e had substantial discretion to invest or spend those funds, much like a professional trustee or a financial adviser with discretion to invest."  United States v. Shevi, 345 F.3d at 680.

Here, there are few additional facts to distinguish Rainbird and Ortiz' relationship from that of an uncle and a niece.  While Rainbird held a prominent position in his community which might have led Ortiz to rely on Rainbird, there are few facts indicating that she was dependent on him or

-28-

entitled to rely on him in a manner "akin to a fiduciary function." United States v. Brunson, 54 F.3d at 678. Additionally, the facts do not indicate that she was particularly susceptible to someone else's influence. Ortiz was an adult when she began working for Rainbird, had a college education, and had almost received her masters in business administration. She was also actively involved in the administration of the business and was a manager who answered only to Rainbird. While she may have deferred to Rainbird on how to handle the notices of Jenkins Act violations, and in doing so may not have acted unreasonably, she still pled guilty to several misdemeanor offenses. The United States found her sufficiently culpable to join her as a co-Defendant in this case. As the Third Circuit has discussed: "[L]ikening the criminalization of a [relative] to an abuse of trust misrepresents the rationale behind the section 3B1.3 enhancement." United States v. Monaco, 23 F.3d at 800-01. Furthermore, unlike an attorney or a physician who breaches legal and ethical duties when they take advantage of their client, the United States has not identified any formal legal or ethical obligations Rainbird owed to Ortiz. While formal obligations may not be strictly required to justify an enhancement, an enhancement is appropriate only when the defendant's role is "[s]omething more akin to a fiduciary function." United States v. Brunson, 54 F.3d at 678. The United States relies primarily on Rainbird's former public offices to distinguish the relationship between Rainbird and Ortiz. See Response to PSR at 4. Rainbird served as the Chief Judge for the Pueblo de San Ildefonso from 1999 to 2005. See PSR ¶ 85, at 22. Rainbird served as the Lieutenant Governor for the Pueblo de San Ildefonso from 2008 to 2010. See PSR ¶ 83, at 21-22. Rainbird and Ortiz received notices of Jenkins Act violations during the years 2004 through 2008. See PSR ¶¶ 24-25, at 10. While it is true that Rainbird had some legal training, there is no indication he was an attorney. Ortiz never consulted anyone other than Rainbird about these notices, even though it appears that Rainbird and Ortiz received multiple notices regarding Jenkins Act violations.

Furthermore, Ortiz was directly under Rainbird in these businesses and was knowledgeable about the operation of the business. Most importantly, the Tenth Circuit contemplates that this enhancement generally applies in situations "where someone uses a fiduciary or personal trust relationship[4] to perpetrate the charged offense against the beneficiary of the trust." United States v. Evans, 44 F.App'x at 453. There are no allegations that Rainbird committed any offenses against Ortiz, whom the United States argues was the beneficiary of his trust. U.S.S.G. § 3B1.3 does not contemplate co-defendants relying on each other, but rather focuses on victims of the offense relying on the person who committed the offense. See United States v. Evans, 44 F.App'x at 453. Absent more evidence indicating that Ortiz was a victim of Rainbird's offenses or that there was something akin to a fiduciary relationship between Rainbird and Ortiz, the United States has not met its burden to prove that Rainbird stood in a position of trust with respect to Ortiz. See United States v. Manatau, 647 F.3d at 1054 n.2.[5]

Additionally, even if Rainbird were serving as something akin to a fiduciary in his relationship with Ortiz, there is little indication that Rainbird's abuse of those obligations "contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more

---

[4]A personal trust relationship in this context requires "[s]omething more akin to a fiduciary function," as it is not sufficient to show "that the victim had confidence in the defendant." United States v. Brunson, 54 F.3d at 678.

[5]When the Court sentenced Ortiz, it recognized that she was not as culpable as Rainbird and that she in some ways justifiably relied on Rainbird. While the Court's conclusions regarding the application of an abuse of trust enhancement might, at first glance, appear in tension with its prior determinations regarding Ortiz' culpability, the application of this enhancement is a separate issue and requires a greater showing of trust and justification for the victim's trust. See United States v. Brunson, 54 F.3d at 678. A person may justifiably rely on someone else without a relationship akin to a fiduciary relationship existing between them. See United States v. Brunson, 54 F.3d at 678.

difficult)."  U.S.S.G. § 3B1.3 cmt. n.1.  The United States has not argued in its Response to PSR that

Rainbird's interactions with Ortiz made his commission of these offenses less detectable, but only

that he "told her that the notices" regarding Jenkins Act violations "did not apply to the organization

and instructed her to keep the letters in a file."  Response to PSR at 4.  The facts indicate that

Rainbird organized these businesses, ran them, and received the largest share of the profits from the

business.  Keeping notices of violations in a file cabinet would not make concealment of his offenses

easier, and the United States has not argued that this specific conduct made it more likely that Ortiz

would face criminal consequences as opposed to Rainbird.  Thus, the Court concludes that an

enhancement under U.S.S.G. § 3B1.3 is not warranted.

## II.     RAINBIRD DID NOT USE ANY SPECIAL SKILLS WHILE COMMITTING THE OFFENSE.

The United States must satisfy two elements to meet U.S.S.G. § 3B1.3, establishing: (i) the

defendant possessed a special skill or a position of trust; and (ii) the defendant used that skill or

abused that position to significantly facilitate the commission or concealment of the offense.

See United States v. Burt, 134 F.3d at 998-99.  Application note 4 defines "Special skill" as "a skill

not possessed by members of the general public and usually requiring substantial education, training

or licensing.   Examples would include pilots, lawyers, doctors, accountants, chemists, and

demolition experts."  U.S.S.G. § 3B1.3 cmt. n.4.

There is no indication that Rainbird had any special skills as U.S.S.G. § 3B1.3 defines that

term.  While it is true that Rainbird was both a tribal Lieutenant Governor and a tribal judge of the

Pueblo de San Ildefonoso, see Objections to PSR at 5 (admitting these facts), there is no indication

that Rainbird ever became licensed as an attorney.  The PSR indicates that Rainbird attended school

at St. John's College in Santa Fe in 1973.  See PSR ¶ 78, at 21.  He then attended the College of

Santa Fe in 1976.  He earned a bachelor's degree in political science.  See PSR ¶ 78, at 21.  The PSR

states that, from 1977 to 1978, Rainbird attended the School for the State Judiciary in Reno, Nevada.

See PSR ¶ 79, at 21.  The PSR does not state that Rainbird ever received his law license or a law

degree, which usually requires three years of law school.  Rainbird then went to graduate school

from 1983 to 1985 where he took graduate classes in public administration.  See PSR ¶ 80, at 21.

Rainbird served as a tribal judge "off and on" since 1977.  PSR ¶ 85, at 22.  Rainbird served as the

Chief Judge for the Pueblo de San Ildefonso from 1999 to 2005.  See PSR ¶ 85, at 22.  Rainbird

served as the Lieutenant Governor for the Pueblo de San Ildefonso from 2008 to 2010.  See PSR

¶ 83, at 21-22.

        The Tenth Circuit "interpret[s] the Sentencing Guidelines according to accepted rules of

statutory construction."  United States v. Nacchio, 573 F.3d at 1066.  "Statutory construction must

begin with the language employed by [the writer] and the assumption that the ordinary meaning of

that language accurately expresses the legislative purpose."  Park 'N Fly, Inc. v. Dollar Park & Fly,

Inc., 469 U.S. at 194.  By itself, holding a position of public office is not a "special skill."  U.S.S.G.

§ 3B1.3.  The New Oxford American Dictionary defines a skill as "the ability to do something well,"

"expertise," or "a particular ability."  New Oxford American Dictionary 1637 (Angus Stevenson &

Christine A. Lindberg eds., 3d ed. 2010).  The New Oxford American Dictionary defines special as

"better, greater, or otherwise different from what is usual."  While it is true that "members of the

general public" do not typically hold elected office, there are generally no or minimal qualifications

to run for public office in this country, and the United States has not argued that tribal judges must

be attorneys.  U.S.S.G. § 3B1.3 cmt. n.4.  Furthermore, looking at the sentencing guideline as a

whole, as statutory construction requires, see United States v. Atl. Research Corp., 551 U.S. at 135,

interpreting the provision regarding special skill to include holding public office would create too

much of an overlap between the phrases "used a special skill" and "abused a position of public or private trust," U.S.S.G. § 3B1.3.  Courts must strive to interpret a statute so that it gives every word in that statute operative effect.  See United States v. Nordic Vill., Inc., 503 U.S. at 35.  Statutory construction normally requires courts to give words connected by a disjunctive separate meanings.  See Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979).  The term "public or private trust" contemplates positions of public office.  U.S.S.G. § 3B1.3.  Interpreting the phrase "special skill" to include positions of public office would not be consistent with the canons of statutory construction.  U.S.S.G. § 3B1.3.  In an analogous context and applying similar rationales as this Court, the Sixth Circuit recognized that this special skill provision did not include a person's skills as an office manager, as they did not require substantial education, training, or licensing.  See United States v. Tatum, 518 F.3d 369, 375 (6th Cir. 2008)("The skills possessed by Tatum as an office manager -- even as a skilled and experienced office manager -- do not qualify as special skills for the purpose of the enhancement.").  Likewise, during a large portion of the time Rainbird was engaging in criminal conduct, he did not hold public office.

Furthermore, Rainbird did not have any special skills based on his minimal legal training.  Although Rainbird attended one year of school at the School for the State Judiciary in Reno, Nevada, he never received a law license or obtained a law degree.  There is no evidence to suggest that tribal judges require a law degree for their position.  Without obtaining a law degree or receiving a law license, he did not have the "substantial education, training or licensing" that application note 4 to U.S.S.G. § 3B1.3 contemplates.  U.S.S.G. § 3B1.3 cmt. n.4.  While the application note suggests recognizes that "education" can be a basis for obtaining a special skill, the education must be "substantial."  U.S.S.G. § 3B1.3 cmt. n.4. The Court has little information about the nature of this school, but assumes it is for state judges who are full-time judges and so the school

is part time.  The United States has the burden to present evidence to establish that an enhancement applies.  See United States v. Manatau, 647 F.3d at 1054 n.2.  In any case, the Court does not have sufficient information to conclude that this education is substantial within the meaning of U.S.S.G. § 3B1.3.  Similarly, while the application note also recognizes that "training" can be a basis for obtaining a special skill, that provision would apply more readily to professions or occupations that do not require education or a license, such as a craftsmen with specialized knowledge.  The legal field requires both three years of legal education and a license to practice law.  Furthermore, the examples the application note provides, including "pilots, lawyers, doctors, accountants, chemists, and demolition experts," include people who have professional degrees and those with highly specialized training, such as a demolition expert.  U.S.S.G. § 3B1.3 cmt. n.4.  While the list is not exhaustive, a person with one year of education at a school for judges is distinct from a lawyer, which the United States Sentencing Commission included as an example of a person with special skills.  The legal profession and respective licensors recognize this distinction.  Furthermore, when interpreting a criminal statute, "it must be strictly construed, and any ambiguity must be resolved in favor of lenity."  Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 408 (2003).

## III.   RAINBIRD'S CONDUCT DOES NOT QUALIFY FOR AN ENHANCEMENT UNDER U.S.S.G. § 3B1.1(a) AS OTHERWISE EXTENSIVE CRIMINAL ACTIVITY.

"Neither the Guidelines nor the cases interpreting § 3B1.1 provide a precise definition of 'otherwise extensive.'"  United States v. Yarnell, 129 F.3d at 1139.  "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered."  U.S.S.G. § 3B1.1, cmt. n.3.  "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility."  U.S.S.G. § 3B1.1 cmt. background.

Among the factors a sentencing court should consider when weighing an aggravating-role enhancement, specifically whether a person is a leader or organizer, are:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1, cmt. n.4.  The Tenth Circuit has "elaborated that '[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures.'"  United States v. Sallis, 533 F.3d at 1223.  The Tenth Circuit accepted the following definition of "otherwise extensive":

> [T]he sentencing court is free to consider the use of unwitting outsiders in determining if a criminal enterprise is "extensive" within the contemplation of section 3B1.1. . . . The extensiveness of a criminal activity is not necessarily a function of the precise number of persons, criminally culpable or otherwise, engaged in the activity. Rather, an inquiring court must examine the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme.

United States v. Yarnell, 129 F.3d at 1139 (alteration in original).  For example, the Tenth Circuit found a 4-level enhancement appropriate "for a defendant who led a drug conspiracy that involved less than five participants but that supplied hundreds of customers over a three-week period."  United States v. Yarnell, 129 F.3d at 1139.  The Tenth Circuit also found a 4-level enhancement appropriate in a case where "[t]he fraudulent enterprise . . . spread from Denver to Phoenix, St. Louis and Atlanta" that "lasted four months, created at least 40 victims, and generated losses in excess of $140,000," and "involved considerable planning and complex execution, and included at

least one other culpable participant as well as a number of other participants who may not have been culpable."  United States v. Yarnell, 129 F.3d at 1139.

The United States argues that Rainbird had thousands of foreign state customers from his internet business.  See Response to PSR at 2.  The United States points out that the scheme lasted for approximately five years.  See Response to PSR at 2.  The United States argues that Rainbird uses the services of many other unknowing outsiders, including postal employees and postal truck drivers.  See Response to PSR at 2.  The United States also notes that Rainbird had at least five other individuals working for his business on a sustained daily basis for five years.  See Response to PSR at 2.  The United States notes that Rainbird's business also involved engaging the services of an accounting firm.  See Response to PSR at 3.  They also point to his use of credit cards and several banks.  See Response to PSR at 3.

The USPO disagreed with this objection, noting that the only other participant in the crimes is Ortiz, and that her role appears to be minor based on the facts of the case and her role in taking direction from Rainbird.  See Addendum to PSR at 2.  The UPSO also notes that she appears less culpable because she benefitted less financially than Rainbird.  See Addendum to PSR at 2.  The USPO notes that, while other entities were used to perpetrate the offense, "it could not be determined the other entities and their service were used by [Rainbird] with specific criminal intent."  Addendum to PSR at 2.  The USPO states that Rainbird used his credit card for postage and personal expenses, but that its use was not otherwise extensive.  See Addendum to PSR at 2.  The USPO notes that the other participants to the scheme, the employees, were not necessary to facilitate the offense.  See Addendum to PSR at 2.

This scheme was not otherwise extensive under the definition of U.S.S.G. § 3B1.1(a).  It is true that the scheme lasted for five years and involved a variety of different states.  It is also true that

the total amount of cigarette sales involved was $18,971,482.62 with a retail value of approximately $26,220,615.38.  See PSR ¶ 42, at 14.  As the USPO noted, however, it is not clear that the other participants in the scheme were necessary to facilitate the offense.  The main participant other than Rainbird, Ortiz, played a minor role in the criminal activity compared to Rainbird.  "The comments to § 3B1.1 define a participant as someone who is criminally responsible for the commission of the offense even if he was not criminally convicted."  United States v. Scott, 529 F.3d 1290, 1303 (10th Cir. 2008).  There is no evidence that Rainbird recruited other accomplices besides Ortiz.  Similarly, the use of things such as credit cards and bank accounts should not by itself result in a 4-level enhancement for otherwise extensive criminal activity, as it is not clear those things would be necessary to the criminal scheme.  See United States v. Carrozzella, 105 F.3d 796, 803-04 (2d Cir. 1997), abrogated on other grounds by United States v. Kennedy, 233 F.3d 157 (2d Cir. 2000).  As the United States Court of Appeals for the Second Circuit has stated:

> Lawful services that are not peculiarly tailored and necessary to a particular crime but are fungible with others generally available to the public are not the functional equivalent of knowing participation.  To hold otherwise would sweep within Section 3B1.1(a) activity that is far less culpable than organizing and leading five knowing participants.

United States v. Carrozzella, 105 F.3d at 804.  The harm to any businesses that interacted with Rainbird in selling him cigarettes may be significant, but it resulted in part from their own credulity. The harm to the respective tax authorities, however, is significant.  While the criminal operation was large, the United States has not argued that it required significant planning, preparation, or skillful execution.  The scope of the scheme, while significant, involved only the sale of cigarettes as opposed to some other more extensive criminal operation.  As the USPO has concluded, application of U.S.S.G. § 3B1.1(c), still a 2-level enhancement, is more appropriate based on the facts of this case.  The Tenth Circuit has affirmed district courts who have concluded that otherwise extensive

criminal activity existed in cases where the criminal activity was arguably less extensive than in this case.  The Court concludes, however, that it is more appropriate to apply the 2-level enhancement rather than the 4-level enhancement.  While it is true that Rainbird would qualify as a leader or organizer under this guideline, the Court concludes that a 2-level enhancement is more appropriate under these circumstances, because there was not much more structure to this criminal organization than Rainbird and Ortiz.

## IV.   THE COURT WILL REQUIRE RAINBIRD TO PAY $94,500.00 IN RESTITUTION PURSUANT TO THE TERMS OF THE PLEA AGREEMENT.

The parties agreed that Rainbird would pay $94,500.00 in restitution.  See Plea Agreement ¶ 6, at 3-4.  Rainbird agreed that he would pay $34,500.00 to the New Mexico Taxation and Revenue Department ("NMTRD") and $60,000.00 to the Pueblo de San Ildefonso.  See Plea Agreement ¶ 6, at 3-4.  The PSR did not provide commentary disagreeing with the amount of restitution the United States and Ortiz agreed to in the Plea Agreement.  See Plea Agreement ¶¶ 46, 118, at 14, 30.  Rainbird pled guilty to the following offenses: (i) Jenkins Act violations under 15 U.S.C. § 376; (ii) possession, sale and transport of contraband cigarettes under 18 U.S.C. § 2342(a); and (iii) false statement or representation regarding cigarette recordkeeping under 18 U.S.C. § 2342(b).  These crimes are not crimes listed in 18 U.S.C. § 3663(a)(1) for which a district court may order restitution in addition to or in lieu of other penalties authorized by law.  See 18 U.S.C. § 3663(a)(1) (authorizing restitution for crimes under "section 401, 408(a), 409, 416, 420, or 422(a) of the Controlled Substances Act . . . or section 5124, 46312, 46502, or 46504 of title 49, other than an offense described in section 3663A(c)"); PSR ¶ 117, at 30 ("Although the Mandatory Victims Restitution Act (MVRA) of 1996 is not applicable in this case, and does not apply to the Jenkins

Act, the defendant has agreed to pay restitution as a condition of supervision").[6]  Thus, a Court may only impose restitution for these violations when the parties agree to restitution in a plea agreement. See 18 U.S.C. § 3663(a).  18 U.S.C. § 3663(a)(3) provides that a district court "may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement."  18 U.S.C. § 3663(a)(3).  "Under 3663(a)(3)," a "district court can only order restitution to the extent agreed upon in the plea agreement."  United States v. Guthrie, 64 F.3d at 1515.  If the defendant does not stipulate to an amount of restitution to be paid under the plea agreement but does agree to pay restitution, a district court must "determine the appropriate amount in accordance with the provisions of 18 U.S.C. § 3664."  United States v. Guthrie, 64 F.3d at 1515.

"Under 3663(a)(3)," a "district court can only order restitution to the extent agreed upon in the plea agreement."  United States v. Guthrie, 64 F.3d at 1515.  Here, it is not necessary for the Court to calculate an appropriate amount of restitution, as the parties have agreed on the appropriate amount.  The parties have agreed that $94,500.00 in restitution reflects "the practical, applicable restitution amount in this case given the financial resources of the Defendant and the financial needs and earning ability of the defendant and the Defendant's dependents."  Plea Agreement ¶ 6, at 4. Because the parties have agreed that Rainbird must pay $34,500.00 in restitution to the NMTRD and $60,000.00 in restitution to the Pueblo de San Ildefonso, the Court must accept this stipulation.

## V.   **THE COURT WILL DOWNWARDLY VARY TO A SENTENCE OF 33 MONTHS.**

The Court concludes that the sentencing guidelines do not apply to Rainbird's Jenkins Act violations, Counts 54 through 58, because the offenses to which he has pled guilty are Class B

---

[6]The Court also notes that 18 U.S.C. § 2259 does not apply to these offenses, as that statute only involves restitution for offenses committed under Chapter 110 of Title 18 of the U.S.C., which involve sexual exploitation and abuse of children.  See 18 U.S.C. § 2259.

misdemeanors.  U.S.S.G. § 1B1.9 provides: "The sentencing guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction."  U.S.S.G. § 1B1.9.  Rainbird pled guilty to violations of 15 U.S.C. § 376.  Before March 31, 2010, violations of this provision were Class B misdemeanors.  See Act of Oct. 19, 1949, ch. 699, § 3, 63 Stat. 884, 885 ("Whoever violates the provisions of this Act shall be guilty of a misdemeanor and shall be fined not more than $1,000 or imprisoned not more than six months or both").  Rainbird was originally indicted on October 8, 2009.  See Doc. 1.  The Superseding Indictment was filed on December 3, 2009.  See Doc. 20.  Both of these dates predate March 31, 2010, when these statutory amendments made violations of 15 U.S.C. § 376 a felony.  A sentence of not more than six months, which was the statutory maximum under the version of 15 U.S.C. § 376 in effect at the time Rainbird was indicted, qualifies as a Class B misdemeanor as U.S.S.G. § 1B1.9 defines that term.  See U.S.S.G. § 1B1.9 cmt. n.1 (defining a Class B misdemeanor as "any offense for which the maximum authorized term of imprisonment is more than thirty days but not more than six months").

The sentencing guidelines apply to the rest of the Counts to which Rainbird pled guilty -- Counts 32 and 33.  These two Counts are felonies.  The Court notes that Rainbird evaded paying taxes on cigarettes in the amount of approximately $7,500,000.00.  The Court has carefully considered the parties' arguments and the circumstances of this case.  The Court has considered the guideline range for the applicable category of offense committed by the applicable category of defendant.  The Court believes that the punishment that the guidelines set forth is not appropriate for Rainbird's offense.  After sustaining an objection to the enhancement under U.S.S.G. § 3B1.3 for abuse of position of trust and applying a 3-level reduction for acceptance of responsibility, Rainbird's offense level is 25.  A criminal offense level of 25 and a criminal history category of I yields a guideline imprisonment range of 57 to 71 months.  Pursuant to U.S.S.G. § 5G1.1, the

guideline imprisonment range for Count 32 is 57 to 60 months based on the statutory maximum of 60 months imposed by 18 U.S.C. § 2344(a).   Pursuant to U.S.S.G. § 5G1.1, the guideline imprisonment range for Count 33 is 36 months based on the statutory maximum of 36 months imposed by 18 U.S.C. § 2344(b).  While Rainbird has requested home detention and probation, the Court does not believe that such a low sentence is appropriate for his offenses.  The Court concludes that a variance approximating a 5-level reduction to Rainbird's offense level, thus reducing his offense level from 25 to 20, is appropriate to reflect the mitigating factors in this case.  A criminal offense level of 20 and a criminal history category of I yields a guideline imprisonment range of 33 to 41 months.  The Court believes a sentence of 33-months imprisonment each for Count 32 and Count 33, and 6 months for Counts 54 through 58 is appropriate to reflect the seriousness of these offenses.  The sentences will run concurrently.

There are mitigating factors that counsel in favor of a downward variance.  The letters people sent on Rainbird's behalf indicate that many people believe he was a generous and helpful leader in his community, but those letters also compel the Court to the conclusion that many people look up to Rainbird as an example.  While the Court has no reason to doubt that Rainbird has been an influence and a role model in his community, the Court cannot give him special treatment solely because of that reason or because of his place in society.  Probation and home detention would send the wrong message to the community given the magnitude of his crimes.  Given the seriousness of the offense, some incarceration is necessary to promote respect for the law.  The positive impact Rainbird has made, however, counsels the Court to impose a sentence below the guideline range.

Another way the Court looked at Rainbird's case is that it took his suggestion for a base offense level of 10 and identified ten aggravating factors: (i) Rainbird's systematic tax avoidance; (ii) the reality that he should have sought legal advice; (iii) that the Court should not vary merely

-41-

because Rainbird's case involves a white-collar crime of tax avoidance, which would unfairly punish the less well off for their crimes; (iv) Rainbird's dramatically different relationship to the crimes than Ortiz'; (v) Rainbird was the genesis for this crime; (vi) Rainbird had control of the businesses; (vii) Rainbird controlled the funds of the businesses and the proceeds from the crimes; (viii) there should be a distinction in Ortiz' and Rainbird's sentences; (ix) there were many victims and, given the Supreme Court case, a lot of publicity about the crimes; and (x) he lived well and did not put the money back into the community. These ten aggravating factors justify ten additional offense levels above Rainbird's requested offense level. They support that his proposed offense level of 10 is too low and should be at least double that amount.

When the Court looks at the factors in 18 U.S.C. § 3553(a), the factors of the seriousness of the offense and promoting respect for the law counsel against a variance. The factor of just punishment supports some variance. The factor of adequate deterrence points in different directions; while there is little need for specific deterrence for Rainbird, there is a need for general deterrence, so people like Rainbird do not commit similar crimes. There is probably no need to emphasize the factor of protecting the public, as Rainbird is unlikely to commit any crime on this scale in the future. The Court will be able to rehabilitate Rainbird and ease him back into society with conditions of release. Thus, there are two full factors and two half factors that weigh in favor of a variance. The Court thus believes it should vary at least 3 levels to an offense level approximating 22, and no more than to 20. Given the parsimony clause in 18 U.S.C. § 3553(a), the Court finds that a variance to an offense level approximating 20 is more appropriate as that level would be sufficient without being greater than necessary to reflect the factors in 18 U.S.C. § 3553(a). The Court believes that its analysis, still heavily grounded in the guidelines, counsels for a variance, but still reflects the values underlying the guidelines. A criminal offense level of 20 and a criminal history

category of I yields a guideline imprisonment range of 33 to 41 months. While the Court's task, as

a district court, is not to arrive at a reasonable sentence -- it is to come up with one that reflects the

factors in 18 U.S.C. § 3553(a), see United States v. Conlan, 500 F.3d 1167, 1169

(10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence. Rather, a district

court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with

the purposes of section 3553(a)(2)." (citation omitted)) -- the Court believes this sentencing range

is reasonable and more reasonable than the guideline sentencing range, and better reflects the factors

in 18 U.S.C. § 3553(a) than does a sentence at the statutory maximum or Rainbird's requested

sentence of home detention and probation. And perhaps most important in this calculation, the

Court believes that this sentencing range is sufficient without being greater than necessary to comply

with the purposes of punishment Congress set forth in the Sentencing Reform Act of 1984, Pub. L.

No. 98-473, 98 Stat. 1987 (codified as amended in scattered sections of 18 U.S.C.). The Court

sentences Rainbird to 33-months imprisonment for each Counts 32 and 33. The Court sentences

Rainbird to 6 months for Counts 54 through 58. The sentences will run concurrently.

  **IT IS ORDERED** that the requests in the Response of the United States to Presentence

Investigation Report, filed September 30, 2011 (Doc. 117), are denied. The Court will sustain the

objections and grant in part and deny in part Rainbird's request for a variance contained in

Defendant Paul Rainbird's Objections to the Presentence Investigation Report, Reply to Response

of the United States to Presentence Investigation Report, and Sentencing Memorandum in Support

of a Variance, filed September 30, 2011 (Doc. 118). The Court will vary on Rainbird's sentence,

but not to the level that Rainbird has requested. The Court sentences Rainbird to 33-months

imprisonment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
   United States Attorney
Paul H. Spiers
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Samuel L. Winder
Law Office of Samuel L. Winder, LLC
Albuquerque, New Mexico

  *Attorney for the Defendant*